**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AYODEJI O. BAKARE, M.D., | : | CIVIL ACTION NO. 1:03-CV-1098 |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| v. | : | |
| | : | |
| PINNACLE HEALTH HOSPITALS, | : | |
| INC., et al., | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM**

Presently before the court are motions for summary judgment by

defendants—Pinnacle Health Hospitals, Inc., Pinnacle Health System (collectively,

"Pinnacle"), Roger Longenderfer, M.D. ("Dr. Longenderfer"), Barry B. Moore, M.D.

("Dr. Moore"), Dana Kellis, M.D. ("Dr. Kellis"), Carl Bronitsky, M.D. ("Dr.

Bronitsky"), and David J. Evans, M.D. ("Dr. Evans")—on the antitrust, tortious

interference with contract, breach of contract, and defamation claims of plaintiff

Ayodeji O. Bakare, M.D. ("Dr. Bakare").  For the reasons that follow, the motions

will be granted in part and denied in part.

**I.    Statement of Facts**[1]

   **A.    The Parties**

Pinnacle Health Hospitals, a non-profit corporation, is a subsidiary of

Pinnacle Health System.  Pinnacle Health System was created in 1996 by the

---

[1] In accordance with the standard of review for a motion for summary
judgment, the court will present the facts in the light most favorable to plaintiff, the
non-moving party.  See infra Part II.

merger of Harrisburg Hospital, Seidle Memorial Hospital, and Polyclinic Hospital. (Doc. 103 ¶ 4; Doc. 113 ¶ 4; Doc. 105, Ex. GG at 1, 3-4.)  Pinnacle owns and operates Harrisburg Hospital and numerous outpatient clinics, including the Women's Outpatient Health Center ("WOHC"), an obstetrics and gynecology ("OB/GYN") outpatient clinic. (Doc. 106, Ex. EEE at 10, 29; Doc. 106, Ex. RRR ¶ 21.)

Dr. Bakare is a licensed physician in Pennsylvania and a board certified OB/GYN physician.  (Doc. 113, Ex. 1 ¶ 5.)  When Dr. Bakare began his private medical practice in 1986, he worked part-time at the OB/GYN clinic at Polyclinic Hospital.  From 1987 through August 27, 2002,[2] Dr. Bakare had unrestricted staff privileges at Pinnacle Health Hospitals and/or its predecessors.[3]  From 1987 through August 30, 2002,[4] Dr. Bakare also worked as a contract physician at the OB/GYN clinic of Hamilton Health Center ("Hamilton").  (Doc. 113, Ex. 1 ¶¶ 12-16.)

Since July 2001, Dr. Longenderfer has served as the President and Chief Executive Officer of Pinnacle Health System.  Previously, Dr. Longenderfer was the Chief Operating Officer and Vice President of Medical Affairs for Pinnacle Health

---

[2] See discussion infra Part I.C regarding Dr. Bakare's precautionary suspension on August 27, 2002 and subsequent modification granting conditional privileges.

[3] On November 20, 2001, Dr. Bakare was reappointed to the medical staff of Pinnacle Health Hospitals through November 19, 2003.  (Doc. 103 ¶ 46; Doc. 113 ¶ 46.)

[4] See discussion infra Part I.D.1 regarding the termination of Dr. Bakare's contract with Hamilton on August 30, 2002.

Hospitals.  He is an *ex-officio* member of the Medical Executive Committee ("MEC") of Pinnacle Health Hospitals.  (Doc. 103 ¶¶ 5-7; Doc. 113 ¶¶ 5-7.)

Dr. Kellis has served as the Senior Vice President of Medical Affairs of Pinnacle Health System since August 2001 and is a member of MEC.  (Doc. 103 ¶ 8; Doc. 113 ¶ 8.)

Dr. Bronitsky, a licensed OB/GYN physician, was Chairman of Pinnacle Health Hospitals' OB/GYN Department from 2000 until October 2002, when he moved his medical practice to Arizona.  (Doc. 103 ¶ 12; Doc. 113 ¶ 12.)

Dr. Moore, a physician specializing in neurosurgery, is a member of the medical staff at Pinnacle Health Hospitals and of MEC.  (Doc. 103 ¶ 10; Doc. 113 ¶ 10.)

Dr. Evans, a licensed OB/GYN physician, was the Chairman of Pinnacle's Quality Assessment ("QA") Committee until he left his Pennsylvania practice in August 2001.  He currently practices medicine in Sidney, Ohio.  (Doc. 103 ¶ 14; Doc. 113 ¶ 14.)

### B.   Proposed Combination of Pinnacle and Hamilton's OB/GYN Services

On January 17, 2002, representatives from Pinnacle and Hamilton met to discuss a potential collaboration of their OB/GYN programs.  The preliminary collaboration plan contemplated that Hamilton would:  (1) assume control of Pinnacle's WOHC, (2) lease from Pinnacle the facilities and equipment utilized by the WOHC, and (3) contract with Pinnacle for back office support services (e.g.,

billing).  In addition, Pinnacle would assist Hamilton with quality assurance

programs.  (Doc. 103 ¶ 260; Doc. 113 ¶ 260.)  In February 2002, Pinnacle and

Hamilton exchanged financial information and Pinnacle sent a draft lease for the

WOHC facilities and equipment to Hamilton.  (Doc. 103 ¶¶ 261-62; Doc. 113 ¶¶ 261-

62.)  Hamilton used this information to perform a financial analysis of the proposed

combination.  (Doc. 103 ¶ 263; Doc. 113 ¶ 263.)

Discussions regarding the proposed combination continued during the

summer of 2002.  Representatives of the Pinnacle and Hamilton Boards met and

Hamilton officials toured the WOHC.  (Doc. 103 ¶ 264; Doc. 113 ¶ 264.)  Then, the

first obstacle to the combination arose.  Hamilton's financial advisor reported to the

Hamilton Board that the combined clinic under Hamilton's control would likely

operate at a loss of one million ($1,000,000.00) dollars.  On August 20, 2002, Dr.

Longenderfer discussed Hamilton's financial concerns, specifically this projected

substantial loss, with the Pinnacle Board's executive committee.  Dr. Longenderfer

informed the executive committee that Pinnacle management was exploring

various means of providing financial safeguards to Hamilton.  (Doc. 103 ¶ 265;

Doc. 113 ¶ 265.)

On September 23, 2002, Pinnacle management presented its Board with a specific proposal for the combination with Hamilton.[5]  The proposal provided: (1) Pinnacle would subsidize Hamilton's losses, up to $1 million the first three years, up to $750,000 the fourth year, and up to $500,000 the fifth year; (2) if Hamilton could not operate without the $1 million subsidy by the fourth year, it "may require Pinnacle Health to resume its program at its previous level;" (3) Pinnacle would receive minority representation on the Hamilton Health Board of Directors; (4) Hamilton would provide 24-7 emergency room coverage at Harrisburg Hospital for medical assistance and uninsured patients who do not have an OB/GYN physician; (5) Hamilton would lease WOHC space at $148,000 per year; and (6) Pinnacle Health would assume a significant role in quality assurance.  (Doc. 104, Ex. C at P00229-31.)  With this proposal, Pinnacle management sought the approval of Pinnacle's Board "for management to enter into an arrangement with Hamilton Health Center to provide for the consolidation of the respective OB/GYN clinics." (Doc. 104, Ex. C at P00230.)  After review of management's proposal, the Pinnacle Board approved the proposal and authorized management to present it to Hamilton.  (Doc. 104, Ex. C at P03188-89.)

---

[5] The executive summary presented to Pinnacle's Board regarding the proposal indicated that "[f]or some time management has been exploring ways to reduce the operating losses from indigent care clinics operated by Pinnacle Health."  (Doc. 104, Ex. C at P00229.)  Pinnacle was losing approximately $2 million per year on its OB/GYN services.  (Doc. 105, Ex. EE at HAM0059.)

On September 24, 2002, Dr. Longenderfer presented an overall concept of the potential combination to the Hamilton Board.  When asked his view of the most difficult aspect of the transition, Dr. Longenderfer responded that cultural issues would be the most difficult, as it was with the merger of Harrisburg and Polyclinic Hospitals.  After Dr. Longenderfer left the Hamilton Board meeting, questions persisted, particularly regarding "concerns about culture and how the physicians could cause the merger between our systems to fail if they were not supportive of the arrangement."  (Doc. 113, Ex. 27 at HAM0059-60; Doc. 103 ¶ 273; Doc. 113 ¶ 273.)  The collective reaction of the Hamilton Board can be described, at best, as "lukewarm."  Ultimately, the Board "voted to authorize staff to continue with discussions with Pinnacle but not to make any commitments."  (Doc. 113, Ex. 27 at HAM0060.)

Not surprisingly, there were no further negotiations between Pinnacle and Hamilton regarding the proposed combination of their OB/GYN services.  Hamilton chose to discontinue discussions because it was concerned about the financial risks involved and the potentially insurmountable "cultural" conflicts between Hamilton

and the WOHC.[6]  (Doc. 106, Ex. III at 51-52, 100.)  During the preliminary

negotiations, the parties did not initiate the lengthy process of securing necessary

government regulatory approvals.  (Doc. 103 ¶ 278; Doc. 113 ¶ 278.)

      If the proposed combination had occurred, it would have been Hamilton's

operation, not Pinnacle's.  Therefore, Hamilton would have been responsible for the

staffing decisions of the combined OB/GYN clinic.  (Doc. 106, Ex. III at 54, 161;

Doc. 106, Ex. MMM at 11; Doc. 106, Ex. FFF at 67.)  According to Hamilton's CEO,

discussions regarding the selection of staff physicians for the combined clinic had

not occurred.  (Doc. 106, Ex. III at 54.)  Discussions about personnel for the

combined operation were limited to staffing patterns, e.g., suggested and budgeted

numbers for various positions.  (Doc. 113, Ex. 42.)  For example, shortly before the

execution of the confidentiality agreement between Pinnacle and Hamilton in

February 2002, Dr. Kellis met with clinical staff from Hamilton to discuss and to

---

[6] In his response to defendants' statement of undisputed facts, Dr. Bakare denied the proffered reasons for Hamilton's termination of negotiations and stated instead that "Hamilton chose to discontinue discussions because Pinnacle refused to subsidize the combined clinic in the manner authorized by Pinnacle's Board of Directors." (Doc. 113 ¶ 274.)  However, Dr. Bakare did not reference any part of the record that supports his assertion.  See L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.").  Therefore, defendants' corresponding statement, which referenced the parts of the record supporting the statement, is deemed admitted.  See id.  This denial is but one example, of many, where plaintiff does not offer record support for his conclusory statements.  (See, e.g., Doc. 113 ¶¶ 121, 148, 150, 233, 255, 272.)  See Elmore v. Clarion Univ. of Pa., 933 F. Supp. 1237, 1247 (M.D. Pa. 1996) (stating that parties have an affirmative duty to proffer citations to relevant evidence); see also L.R. 56.1; Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006).

develop possible staffing structures for the combined clinic.  (Doc. 113, Ex. 29 at P03039.)

        **C.**      **The Review of Dr. Bakare's Standard of Care and Subsequent Corrective Action**

The QA Committee is a committee of the Department of Obstetrics and Gynecology that reviews and analyzes quality of care issues to ensure consistent application of appropriate standards of patient care.  (Doc. 113, Ex. 13 at 14; Doc. 106, Ex. NNN ¶ 8.)  The function of the QA Committee is "to identify a threshold below which most physicians would agree that the care is substandard and above which there may be several levels of acceptable care."  (Doc. 104, Ex. E at P03698.)  Patient care issues may be referred to the QA Committee by any person in the Pinnacle Health System.  (Doc. 106, Ex. WW at 16.)  After committee members review patient charts on their own, the QA Committee discusses the cases to determine whether further review is necessary.  If so, the QA Committee sends a letter to the doctor involved in the case, requesting a detailed explanation.  After receiving a response from the doctor, which normally includes an explanation beyond that contained in the chart, the QA Committee will assign points to the extent warranted.  The assessed points reflect concerns with patient care and their accumulation can subject a physician to chart review and referral to the credentialing committee or MEC.  Once points are assigned to a case, the Chairman of the QA Committee signs a form and sends the case to the Chairman of the OB/GYN Department—in this case Dr. Bronitsky—for his review and approval.  If

8

the Chairman is satisfied with the review process, he will also sign the form and send a letter to the doctor regarding the QA Committee's assessment of points. (Doc. 106, Ex. NNN ¶ 8; Doc. 106, Ex. VV at 17; Doc. 104, Ex. E at P02748, P02761.)

The QA Committee reviewed numerous cases of Dr. Bakare for quality of care issues. (See generally Doc. 104, Ex. E.) As early as December 1999, the QA Committee began reviewing several of the cases at issue in the instant matter. (Doc. 104, Ex. E at P02801.) The QA Committee requested responses from Dr. Bakare, but Dr. Bakare generally failed to respond in a timely manner. (See generally Doc. 104, Exs. E, F.) Ultimately, the QA Committee assigned points to a few of Dr. Bakare's cases. (See, e.g., Doc. 104, Ex. E at P02858-60; Doc. 104, Ex. F at P01062, P01074, P01085, P01093.) In addition to the cases reviewed by the QA Committee, Dr. Kellis independently referred three of Dr. Bakare's cases to Dr. Bronitsky's attention. (Doc. 103 ¶ 111; Doc. 113 ¶ 111.) On March 11, 2002, Drs. Kellis and Bronitsky met with Dr. Bakare to discuss general concerns about his quality of care. (Doc. 103 ¶ 120; Doc. 113 ¶ 120; Doc. 106, Ex. TT at 115.)

On April 1, 2002, Dr. Bronitsky sent a letter to the President of the Medical Staff at Pinnacle Health System requesting his guidance and the guidance of MEC because the QA Committee had identified Dr. Bakare as "falling outside the standard of care" for the OB/GYN Department. (Doc. 105, Ex. L.) On April 23, 2002, MEC formally initiated an investigation into the quality of care issues

involving Dr. Bakare, as identified by the QA Committee.[7]  MEC directed its attorney to notify Drs. Bakare and Bronitsky that it would address this matter during its May 2002 session and that they were invited to attend, make presentations, and respond to questions.  (Doc. 104, Ex. D at P00070, P00786.) MEC's attorney wrote to Drs. Bronitsky and Kellis (Doc. 105, Ex. M) and to Dr. Bakare (Doc. 105, Ex. N)[8] informing them of the pending matter before MEC regarding the request for corrective action against Dr. Bakare.

Dr. Bakare attended the May 28, 2002 meeting of MEC.[9]  Dr. Bronitsky also attended and presented Dr. Bakare's cases, but he neglected to bring the relevant patient charts to the meeting and was unable to respond to specific questions concerning patient care.  (Doc. 113, Ex. 1 ¶¶ 41-43.)  Dr. Bakare responded to Dr.

---

[7] MEC is a committee of Pinnacle Health Hospitals' medical staff charged, in part, with ensuring competent clinical performance for all members with clinical privileges.  (Doc. 113, Ex. 16 art. VI, § 1(A), (B)(11)).  Not only may MEC recommend the "reduction, suspension or revocation of clinical privileges" of a practitioner, but it may also suspend all or a portion of the clinical privileges of a practitioner if the practitioner's "conduct requires that immediate action be taken to protect the life of any patient(s) or to reduce the substantial likelihood of immediate threat to the health or safety of any patient."  (Doc. 113, Ex. 16 art. IX, §§ 4(A)(6), 5(A)).

[8] Dr. Bakare denies receiving this letter.  He contends that MEC's attorney called him one week before MEC's May 2002 session to inform him of the meeting and its subject matter.  According to Dr. Bakare, the attorney told him that there was no requirement that he attend the meeting, but that he was invited to attend. (Doc. 113 ¶ 138; Doc. 113, Ex. 1 ¶ 40.)

[9] During MEC meetings, either the chair or another member would remind the other members of the requirement of strict confidentiality of MEC proceedings. (Doc. 113, Ex. 10 at 22; Doc. 178, Ex. D at 56.)  This policy of confidentiality is not reflected in Pinnacle Health Hospitals' Medical Staff Bylaws.  (See Doc. 113, Ex. 16.)

Bronitsky's presentation and answered questions.  (Doc. 103 ¶ 140; Doc. 113 ¶ 140.)

Because many of the physicians on MEC were not OB/GYN physicians, Dr. Moore

recommended that MEC retain an expert to review the cases and provide an

independent expert opinion.  (Doc. 106, Ex. TT at 147-48; Doc. 113, Ex. 1 ¶ 43.)

Following the presentations regarding Dr. Bakare's cases, MEC directed:

> That an obstetrician/gynecologist outside of the Medical Staff be
> retained to further evaluate the cases in which it is alleged that [Dr.
> Bakare] exercised poor clinical judgment resulting in the provision of
> medical care below accepted standards of medical practice in violation
> of Article IX, Section 1 of the Bylaws.
>
> Upon receipt of the report from the obstetrician/gynecologist in
> accordance with [the item] above, the Committee will determine
> whether and to what extent corrective action will be recommended.

(Doc. 104, Ex. D at P00071.)

Dr. Kellis contacted the American College of Obstetrics and Gynecology

("ACOG") for an expert recommendation.  In July 2002, Dr. Kellis sent the ACOG-

recommended expert a letter, stating, in part:

> I appreciate your willingness to review the accompanying
> charts.  As you are aware, the Medical Staff Executive Committee at
> Pinnacle Health has become aware of quality of care issues with
> regards to Dr. Bakare, the physician responsible for the management
> of these patients.  The Medical Staff would appreciate your assessment
> in each of these cases, of whether or not you believe the care rendered
> was outside the acceptable standards, and if so, some idea of the
> seriousness of the "deficiency."
> * * *
> The following is a brief synopsis of the patient records that are
> of concern.  This is provided, not as an attempt to influence your
> conclusions about these cases, but rather as a guide to assist you in
> your review of the records.

11

(Doc. 105, Ex. O at P00757; see also Doc. 105, Ex. O at P00948-P00949; Doc. 106,

Ex. OOO ¶¶ 5-6.)  Also in July 2002, Dr. Kellis sent a letter by certified mail to Dr.

Bakare.  The letter provided summaries of the ten cases being reviewed by the

expert and invited Dr. Bakare to submit, by August 20, 2002, a written explanation

of the care or a rebuttal to the concern expressed for each case.  The letter also

revealed that MEC would discuss the quality of care concerns at the August 27, 2002

meeting with the information obtained from the expert.  (Doc. 105, Ex. P at P00754-

56.)  Dr. Bakare did not receive this letter—he did not accept delivery of the

certified mail—but testified at his deposition that even if he had, he would not have

responded because Dr. Kellis "had no place for sending me that list."  (Doc. 106,

Ex. TT at 191.)  In a letter dated August 12, 2002, the expert retained by MEC

analyzed each of the ten cases forwarded to him by Dr. Kellis and concluded that

"beyond a reasonable degree of medical certainty [Dr. Bakare's] medical

management falls below the established standards."  (Doc. 105, Ex. O at P00748-52.)

On August 27, 2002, Dr. Kellis presented the cases at issue to MEC.[10]

(Doc. 103 ¶ 156; Doc. 113 ¶ 156.)  To facilitate MEC's review of the matter, Dr. Kellis

prepared a report which included, *inter alia*, an outline of the cases with responses

from Dr. Bakare, if any, and the expert's analysis.  In his report, Dr. Kellis stated:

"The Medical Staff Executive Committee is requested to recommend termination of

Dr. Bakare's medical staff privileges and membership to the Pinnacle Health Board

---

[10] Twenty-eight members of MEC, including Drs. Kellis and Bronitsky were
present at the August 27, 2002 meeting.  (Doc. 104, Ex. D at P00072.)

of Directors."[11]  (Doc. 113, Ex. 32.)  During the meeting, MEC also heard from a

member of the QA Committee, who was invited to the meeting to answer any

additional questions.  (Doc. 104, Ex. D at P00072.)

After hearing the testimony and deliberating for approximately three hours

(Doc. 103 ¶ 159; Doc. 113 ¶ 159), MEC determined that Dr. Bakare "failed to meet

acceptable standards of clinical practice for an obstetrician-gynecologist."

(Doc. 104, Ex. D at P00072.)  MEC also voted to recommend to the Board of

Directors that Dr. Bakare's appointment to the medical staff be revoked.  (Doc. 104,

Ex. D at P00072.)  Finally, MEC voted to "immediately impose upon [Dr. Bakare] a

precautionary suspension of all of his clinical privileges to protect the lives of

patients and to reduce the substantial likelihood of immediate threat to the health

and safety of patients in the Hospitals."[12]  (Doc. 104, Ex. D at P00072.)  MEC's

---

[11] Dr. Kellis's report did not recommend that MEC impose an immediate,
precautionary suspension.  (Doc. 113, Ex. 32.)

[12] The Pinnacle Health Hospitals' Medical Staff Bylaws require that the
affected practitioner be notified after a precautionary suspension.  MEC must
review the precautionary suspension as soon as practicable, but not more than
seven days after imposition.  If MEC does not immediately terminate the
precautionary suspension or cease all corrective action, the affected practitioner is
entitled to the rights as set forth in the Fair Hearing Plan.  (Doc. 113, Ex. 16 art. IX,
§ 5.)

determination and votes were unanimous, with the exception of one abstention.[13]
(Doc. 104, Ex. D at P00072.)

On August 28, 2002, MEC's attorney gave Dr. Bakare notice of the adverse
action taken by MEC.  (Doc. 103 ¶ 164; Doc. 113 ¶ 164; Doc. 105, Ex. Q at P00795.)
The notice informed Dr. Bakare of the precautionary suspension and
recommendation to the Board of Directors as well as MEC's reasons for the
corrective action.  It informed Dr. Bakare that he had thirty days from receipt of the
letter to request a hearing; it also provided him with a summary of his hearing
rights.  (Doc. 105, Ex. Q at P00796-99.)

On September 4, 2002, MEC met with Dr. Bakare and his counsel to review
the precautionary suspension.  During the meeting, Dr. Bakare presented
additional information about his quality of care and the ten cases at issue.  He also
responded to questions posed by members of MEC.  Immediately thereafter, MEC
modified the terms of Dr. Bakare's precautionary suspension by allowing Dr.
Bakare to exercise privileges under certain conditions.  (Doc. 104, Ex. D at P00074-
76; see also Doc. 103 ¶ 166; Doc. 113 ¶ 166; Doc. 105, Ex. R at P00802-03.)

---

[13] Other than Dr. Kellis, none of the MEC members who voted for Dr.
Bakare's precautionary suspension had any involvement in the negotiations
between Pinnacle and Hamilton regarding the potential combination of their
OB/GYN services.  (Doc. 103 ¶ 283; Doc. 113 ¶ 283.)

On September 5, 2002, Dr. Bakare's attorney requested that the Fair Hearing Committee ("FHC")[14] review the corrective action taken by MEC.  (Doc. 103 ¶ 175; Doc. 113 ¶ 175; Doc. 105, Ex. U.)  FHC met fifteen times between November 5, 2002 and February 13, 2003, absorbed over thirty hours of testimony, and deliberated for approximately four and a half hours.  Ultimately, FHC rejected MEC's determination that Dr. Bakare failed to meet acceptable standards of clinical practice.  FHC recommended to MEC that it modify its  adverse recommendation to Board of Directors to provide that Dr. Bakare must, as a condition to his continued membership on the medical staff, abide by certain conditions regarding response time for written inquiries and documentation requirements.  (Doc. 34, Ex. 12.)  FHC succinctly observed:  "because of flaws in the process and an insufficient attention to detail, much of the information presented to the MEC was misinformation.  Simply put, too many 'facts' were wrong."[15]  (Doc. 34, Ex. 12.)  However, FHC did "not believe that the MEC acted in bad faith or with malice toward Dr. Bakare during this process.  In fact, based on the information presented to it, the [FHC] believe[d] that the MEC acted reasonably and responsibly."  (Doc. 34, Ex. 12.)

On March 18, 2003, MEC reviewed FHC's report and modified its original determinations and adverse recommendations accordingly.  (Doc. 104, Ex. D at

---

[14] FHC consisted of five medical doctors appointed by the President of the Medical Staff.  (Doc. 103 ¶ 176; Doc. 113 ¶ 176; Doc. 34, Ex. 12.)

[15] FHC outlined the incorrect facts, if any, for each case and why it determined that Dr. Bakare's management of a case did not fall below the standard of care.  (Doc. 34, Ex. 12.)

P00704-15.)  On March 25, 2003, MEC sent its modified determinations and

recommendations to the Board of Directors of Pinnacle Health Hospitals and

vacated Dr. Bakare's suspension.  (Doc. 104, Ex. D at P00716-18.)  On May 19, 2003,

the Board of Directors adopted MEC's modified determinations and

recommendations.  (Doc. 34, Ex. 18.)

> ### D.    Facts Pertinent to Claims Arising from or Related to the Corrective Action

> #### 1.    Disclosures of Dr. Roger Longenderfer and Hamilton

Shortly after the imposition of Dr. Bakare's precautionary suspension, Dr.

Longenderfer communicated with Hamilton's CEO.  He informed her that Dr.

Bakare could no longer supervise Hamilton's midwife and that Hamilton would

need to appoint a new supervisor.[16]  (Doc. 106, Ex. III at 124.)  Dr. Longenderfer did

not elaborate or provide any details about Dr. Bakare's suspension of privileges to

Hamilton's CEO.  (Doc. 106, Ex. III at 124-25.)

On August 30, 2002, Hamilton's Medical Director called Dr. Bakare and

terminated his employment with Hamilton.  (Doc. 113, Ex. 1 ¶ 64.)  In a follow-up

letter to Dr. Bakare dated September 6, 2002, Hamilton's Medical Director stated:

> As mentioned on Friday, August 30, 2002, I very much regret learning
> Harrisburg Hospital has taken action to restrict or revoke your
> privileges at the Hospital.

---

[16] Hamilton's CEO also received a letter to this effect from Pinnacle Health
System.  (See Doc. 106, Ex. III at 23.)

As you know, your contract with [Hamilton] expired August 31, 2002. At this time I must inform you that [Hamilton] will not be renewing your contract; however, when [Hamilton] has completed a chart review and the issues regarding your privileges at Harrisburg Hospital have been resolved, we may be in a position to consider entering into a new contract.

(Doc. 113, Ex. 27 at HAM0003; <u>see also</u> Doc. 113, Ex. 1 ¶ 65.)[17]

## 2.   <u>Disclosures of Dr. Dana Kellis</u>

Three days after Dr. Bakare's precautionary suspension, Dr. Kellis sent a letter to two midwives—one at Hamilton and one at Dr. Bakare's office.  Each letter stated: "Due to Dr. Bakare not having privileges to work within Pinnacle Health Hospitals, we are asking you to provide us with documentation of a new supervising physician as well as a copy of your new collaborative agreement."  (Doc. 113, Exs. 19, 45.)

## 3.   <u>Disclosures of Dr. Barry B. Moore</u>

Shortly after MEC imposed the precautionary suspension on Dr. Bakare, Dr. Moore participated in a discussion, in an operating room lounge, with approximately five nurses, including Kimberly A. Dodson ("Nurse Dodson").[18] (Doc. 106, Ex. GGG at 22; Doc. 113, Ex. 38.)  According to Nurse Dodson, one of the nurses remarked that Dr. Moore appeared to be tired.  Dr. Moore replied that he

---

[17] Dr. Bakare contends, without support, that Hamilton terminated his contract because "Hamilton also did not want [me] to participate in the planned combined clinic."  (Doc. 113 ¶ 233; Doc. 103 ¶ 233.)  See <u>supra</u> note 6.

[18] The identities of the other nurses in the operating room are unknown.

was tired because he was involved with an executive committee that was
investigating surgeons—a heart surgeon and an OB/GYN.  Although the nurses
quickly guessed the name of the heart surgeon, they could not name the OB/GYN.
Dr. Moore hinted:  "Do the initials A.B. mean anything?"  When the nurses still did
not know the name of the OB/GYN, Dr. Moore informed them that it was Dr.
Bakare.  He indicated that the investigation was for substandard care of his
OB/GYN patients and was completely unrelated to the operating room.  (Doc. 113,
Ex. 38; see also Doc. 113, Ex. 8 at 7-8, 13-14.)[19]  According to Nurse Dodson, Dr.
Moore did not inform the nurses that Dr. Bakare had been suspended.  (Doc. 106,
Ex. YY at 15.)  Subsequently, Nurse Dodson told only her husband about the
conversation in the operating room lounge and her opinion that Dr. Bakare is a
good surgeon was unaffected by Dr. Moore's statements.  (Doc. 106, Ex. YY at 8-9,
11-12.)

Upon learning of Dr. Moore's comments in the operating room lounge, Dr.
Bakare became embarrassed and has ostensibly experienced continuing
humiliation, anguish, and emotional distress.  (Doc. 185, Aff. ¶ 4.)

### 4.   __Moonlighting__

Prior to his precautionary suspension, Dr. Bakare participated in the hospital
coverage arrangement (also referred to as "Moonlighting") for the WOHC.

---

[19] Dr. Moore allegedly informed Dr. Bakare's former attorney that he had told
people at Pinnacle that Dr. Bakare provided bad care.  (Doc. 113, Ex. 7 at 14-15, 19.)

Moonlighting is the nighttime and weekend on-call schedule of labor and delivery coverage for WOHC patients who deliver at Harrisburg Hospital.  (Doc. 103 ¶¶ 213, 216; Doc. 113 ¶¶ 213, 216.)  According to Dr. Bakare, every member of the OB/GYN department had an opportunity to participate in the moonlighting rotation,[20] but there was no written policy or understanding regarding the frequency of participation:  "You submitted your name and the days of the month when you were available to work and whoever was making the schedule would plug it in.  You had no way of knowing whether you would get one day a month, two days a month, or no day at all."  (Doc. 106, Ex. TT at 143-44.)  The Medical Director of the WOHC was in charge of the moonlighting schedule.  (Doc. 106, Ex. TT at 144.)  In a letter dated September 2, 2003, the Medical Director informed Dr. Bakare that "[e]ffective immediately, as per recommendations of Pinnacle Health Hospital administration, you will no longer be a moonlighter physician for [the WOHC]."[21]  (Doc. 34, Ex. 22.)

E.   **Procedural History**

On July 1, 2003, Dr. Bakare commenced the instant action.  (Doc. 1.) Subsequent to the court's ruling on defendants' motions to dismiss (see Doc. 31), Dr. Bakare filed an amended complaint on December 5, 2003 (Doc. 33) and a second

---

[20] Dr. Longenderfer indicated that all physicians who have staff privileges at the hospital are eligible for the on-call list.  (Doc. 113, Ex. 2 at 96-97.)

[21] The decision to remove Dr. Bakare from the moonlighting schedule was a joint decision between the Medical Director and Dr. Kellis.  (Doc. 106, Ex. ZZ at 57-62.)

amended complaint (Doc. 36) on January 7, 2004.[22]   Count I of the second amended

complaint is an antitrust claim alleging violations of sections 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1-2, and seeking treble damages pursuant to section 4 of

the Clayton Act, 15 U.S.C. § 15.[23]   Counts II through IV allege state law claims of

tortious interference with contract, breach of contract, and defamation.

Defendants Pinnacle Health System, Pinnacle Health Hospitals, and Drs.

Longenderfer, Moore, Kellis, Bronitsky, and Evans[24] filed motions for summary

judgment (Docs. 93-97) on all of Dr. Bakare's claims and seek immunity from money

damages under the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101-

11152, and the Pennsylvania Peer Review Protection Act, 63 PA. STAT. ANN.

§§ 425.1-.4.[25]   The parties have fully briefed the issues and the court held oral

---

[22] By order of April 5, 2005, the court denied Dr. Bakare's motion for leave to file a third amended complaint.  (Doc. 81).

[23] Because Pinnacle and Hamilton have ceased negotiations to combine their OB/GYN clinics, Dr. Bakare's request for injunctive relief is moot.

[24] During oral argument on the motions for summary judgment, Dr. Bakare acknowledged the abandonment of all claims against Dr. Evans.  See Jordan v. Stanziola, 96 F. App'x 839, 841 n.2 (3d Cir. 2004) (stating that a party had abandoned a claim when "counsel explicitly abandoned that claim at oral argument"); see also FED. R. CIV. P. 56(d).  Accordingly, the court will grant summary judgment in favor of Dr. Evans on Dr. Bakare's antitrust and tortious interference with contract claims without further discussion.

[25] Defendants also filed a motion (Doc. 123) to strike portions of Dr. Bakare's affidavit opposing the motions for summary judgment.  Because the challenged portions of the affidavit do not affect the court's disposition of the motions for summary judgment, the court will deny the motion to strike as moot.

arguments on the motions on June 22, 2006.  The motions are now ripe for

disposition.

## II.   <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact," and for which a jury trial

would be an empty and unnecessary formality.  <u>See</u> Fed. R. Civ. P. 56(c).  It places

the burden on the non-moving party to adduce "affirmative evidence, beyond the

allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of</u>

<u>Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); <u>see also</u>

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986);

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see</u>

<u>also</u> Fed. R. Civ. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III.   <u>Discussion</u>

Defendants contend that they are entitled to immunity from money damages

under the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101-11152, and the

Pennsylvania Peer Review Protection Act, 63 Pa. Stat. Ann. §§ 425.1-.4.

Defendants also assert that they are entitled to summary judgment on plaintiff's

antitrust, tortious interference with contract, breach of contract, and defamation

claims.  The court will address these issues *seriatim*.

A.      **Federal and State Peer Review Immunity**

Congress enacted the Health Care Quality Improvement Act ("HCQIA" or "the Act") "to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior" and "to deter antitrust suits by disciplined physicians." Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 632-33 (3d Cir. 1996) (quoting H.R. Rep. No. 99-903 (1986), reprinted in 1986 U.S.C.C.A.N. 6287, 6384); see also Gordon v. Lewistown Hosp., 423 F.3d 184, 201 (3d Cir. 2005).  The Act provides immunity from money damages for those engaged in a professional review action that satisfies the standards of HCQIA.  See 42 U.S.C. § 11111(a)(1).  HCQIA immunity applies if a professional review action is taken:

> (1)     in the reasonable belief that the action was in the furtherance of quality health care,
> (2)     after a reasonable effort to obtain the facts of the matter,
> (3)     after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4)     in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

Id. § 11112(a).  The Act includes a presumption that a professional review action meets the above-quoted standards for immunity "unless the presumption is rebutted by a preponderance of the evidence."  Id.  In the context of a motion for summary judgment, this presumption means that "the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable."  Gordon, 423 F.3d at 202

(emphasis added); <u>see also</u> <u>Brader v. Allegheny Gen. Hosp.</u>, 167 F.3d 832, 839 (3d

Cir. 1999).  An objective standard applies when analyzing a professional review

action; the court must look at the totality of the circumstances.  <u>See</u> <u>Mathews</u>, 87

F.3d at 635.

1.    **Reasonable Belief that the Action Furthered Quality Health Care**

The court finds that Dr. Bakare has failed to adduce any evidence from which a jury could reasonably conclude that MEC's corrective action[26] against him was not taken "in the reasonable belief that the action was in the furtherance of quality health care." 42 U.S.C. § 11112(a)(1).  MEC based its decision, in part, on the QA Committee's findings of substandard care, which the QA Committee had evaluated over a significant period of time.  The QA Committee's concerns were

_____

[26] Dr. Bakare argues that numerous activities surrounding the action taken by MEC do not comply with HCQIA requirements.  However, professional review *activity*, unlike a professional review *action*, is not subject to the requirements of § 11112(a).  See Mathews, 87 F.3d at 634.  A professional review action is:

> [A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

Id. § 11151(9); see also Mathews, 87 F.3d at 634 ("The definition of 'professional review action' encompasses decisions or recommendations by peer review bodies that directly curtail a physician's clinical privileges . . . .").  In contrast, professional review *activity* involves "the investigative process during and/or upon which a professional review action, i.e., a decision, is made."  Id. (citation omitted).  The professional review *action* in the instant matter is MEC's decision to impose a precautionary suspension and to recommend the revocation of Dr. Bakare's appointment to the medical staff.  The other conduct challenged by Dr. Bakare—e.g., the QA Committee's assessment of points and Dr. Kellis's investigation into the facts of the cases at issue—is professional review *activity*, not subject to the requirements of § 11112(a).  See id.  Accordingly, the relevant inquiry is whether MEC's corrective action complied with the requirements of HCQIA, not whether the initial QA Committee assessment or the investigation complied with these requirements.

then corroborated by an independent OB/GYN expert who concluded that "beyond

a reasonable degree of medical certainty [Dr. Bakare's] medical management falls

below the established standards." (Doc. 105, Ex. O at P00748-P00752.)  Prior to

rendering its initial decision, MEC also questioned a member of the QA Committee

who was familiar with the cases at issue.  Based upon all of this information, MEC's

initial decision was reasonable.  Indeed, Dr. Bakare testified at his deposition that

"if I as a physician were sitting on the MEC" and listened to the information

presented during the August 27, 2002 meeting, "I would personally vote that the

doctor should never be allowed to practice anywhere in the world." (Doc. 106,

Ex. TTT at 146.)

Dr. Bakare's argument that HCQIA immunity does not apply because Dr.

Kellis had anticompetitive motives is unavailing.  First, Dr. Bakare has not

produced any evidence that anticompetitive considerations entered into MEC's

decision-making process.  Moreover, "[a]ssertions of bad faith or anticompetitive

motives are irrelevant to the question of whether a decision was taken in a

reasonable belief that it would further quality health care.  Instead, the court must

consider the adequacy of the basis for the decision made." Mathews v. Lancaster

Gen. Hosp., 883 F. Supp. 1016, 1030 (E.D. Pa. 1995) (citing Bryan v. James E.

Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1335 (11th Cir. 1994)), aff'd, 87 F.3d 624 (3d

Cir. 1996).  That FHC ultimately determined that Dr. Bakare's care did not fall

below the standard of care does not transform MEC's corrective action into an

unreasonable one.  See Brader, 167 F.3d at 841 ("[E]ven if [the plaintiff] could show

that these doctors reached an incorrect conclusion . . . , that does not meet the
burden of contradicting the existence of a reasonable belief that they were
furthering health care quality." (quoting <u>Imperial v. Suburban Hosp. Ass'n</u>, 37 F.3d
1026, 1030 (4th Cir. 1994))); <u>see also</u> <u>Sklaroff v. Allegheny Health Educ. Research</u>
<u>Found.</u>, No. Civ.A. 95-4758, 1996 WL 383137 (E.D. Pa. July 8, 1996).  The
overwhelming evidence demonstrates that MEC's decision was reasonable in light
of the facts known at the time the decision was made, as corroborated by the
independent OB/GYN expert who reviewed the cases.  Despite its contrary opinion
regarding Dr. Bakare's quality of care, FHC notably concluded that "based on the
information presented to it, . . . the MEC acted reasonably and responsibly."
(Doc. 34, Ex. 12.)

For these reasons, the court finds that no reasonable jury would conclude
that MEC did not act with the "reasonable belief that the action was in the
furtherance of quality health care."  42 U.S.C. § 11112(a)(1).

## 2.   <u>Reasonable Effort to Obtain the Facts</u>

The court also finds that Dr. Bakare has not overcome the presumption that
MEC undertook "reasonable efforts to obtain the facts" before taking action.
42 U.S.C. § 11112(a)(2).  The evidence demonstrates that Dr. Bakare's quality of care
was originally questioned by the QA Committee, comprised of members in the same
speciality as Dr. Bakare.  The QA Committee reviewed Dr. Bakare's cases and

assigned points to some of them.[27]  MEC acted on a request from the Chairman of

the OB/GYN Department to review Dr. Bakare's cases for possible corrective

action.  Rather than relying solely on the review of cases by the QA Committee, and

recognizing the need for objective expertise in Dr. Bakare's speciality, MEC also

sought the assessment of an independent OB/GYN expert, recommended by the

ACOG.  To facilitate this assessment, Dr. Kellis provided the expert with summaries

of the cases at issue[28] as well as the patient charts.[29]  MEC also permitted Dr.

Bakare to respond to questions about the cases at issue during its May 28, 2002

meeting.  Cf. Sklaroff, 1996 WL 383137, at *8 ("[N]othing in the [HCQIA] requires

that a physician be permitted to participate in the review of his care.").  In addition,

------

[27] Dr. Bakare argues that alleged deficiencies in the QA Committee's process of reviewing his cases and assigning points removes HCQIA immunity.  However, the QA Committee's actions need not satisfy HCQIA requirements of 42 U.S.C. § 11112(a) because they do not constitute professional review actions as defined by HCQIA.  See supra note 26.

[28] Dr. Kellis clearly advised the expert that the case summaries were intended to assist the expert and not to influence his conclusions in any fashion.  (See Doc. 105, Ex. O at P00757.)

[29] Dr. Bakare contends that the appropriateness of his professional performance was readily apparent from the patient charts and that MEC's acceptance of facts contradicted by the patient charts *ipso facto* demonstrates an unreasonable effort on the part of MEC.  For example, Dr. Bakare highlights an assertion in Dr. Kellis's report to MEC that Dr. Bakare did not respond to a call to see a patient for six hours—an assertion contradicted by the patient's chart which reveals that he responded within twenty-five minutes.  This isolated factual discrepancy does not negate MEC's reasonable efforts to obtain the facts.  MEC sent the relevant patient charts to an independent expert who reviewed the cases and concluded that Dr. Bakare's care fell below the standard.  Under these circumstances, MEC's actions were reasonable.

after retaining the expert, MEC attempted to obtain Dr. Bakare's written explanation of the cases at issue.[30]  See id.  Finally, MEC invited and questioned a member of the QA Committee during the August 27, 2002 meeting.

Given the many efforts of MEC to marshal the facts pertinent to Dr. Bakare's cases, no reasonable jury could conclude that MEC did not undertake a "reasonable effort to obtain the facts of the matter" before taking corrective action.  42 U.S.C. § 11112(a)(2); see also Mathews, 87 F.3d at 637 ("The relevant inquiry under § 11112(a)(2) is whether the totality of the process leading up to the Board's 'professional review action' . . . evidenced a reasonable effort to obtain the facts of the matter.").

### 3.   **Adequate Notice and Hearing Procedures**

The court also finds that Dr. Bakare has not overcome the presumption that MEC took action "after adequate notice and hearing procedures" or "after such other procedures as are fair to the physician under the circumstances."  42 U.S.C. § 11112(a)(3).  Under HCQIA, a peer review board may take corrective action in certain circumstances before notice and a hearing.  See Brader, 167 F.3d at 842. The requirements of § 11112(a)(3) do not preclude "an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an

---

[30] Although Dr. Bakare did not accept delivery of Dr. Kellis's letter, he nevertheless acknowledges that he would not have responded to it even if he had received it.  (See Doc. 106, Ex. TT at 191.)

imminent danger to the health of any individual." 42 U.S.C. § 11112(c)(2); see also

Brader, 167 F.3d at 842.

In the matter *sub judice*, MEC imposed an immediate, precautionary

suspension of Dr. Bakare's privileges "to protect the lives of patients and to reduce

the substantial likelihood of immediate threat to the health and safety of patients."[31]

(Doc. 104, Ex. D at P00072.)  The next day, MEC notified Dr. Bakare by letter of the

precautionary suspension, the reasons for the suspension, and his right to request a

hearing within thirty days, and provided Dr. Bakare with a summary of his hearing

---

[31] The court finds that, given the independent expert's assessment of Dr.
Bakare's cases, MEC reasonably believed that the precautionary suspension was
necessary to protect against "imminent danger to the health of any individual."
42 U.S.C. § 11112(c)(2); see also Lee v. Trinity Lutheran Hosp., 408 F.3d 1064, 1072
(8th Cir. 2005) ("[T]he [HCQIA] does not require imminent danger to exist before a
summary restraint is imposed.  It only requires that the danger *may* result if the
restraint is not imposed." (citations omitted)).

rights pursuant to the Medical Staff Bylaws and the Fair Hearing Plan.[32]  Within a

week, MEC reviewed the precautionary suspension and modified the terms of Dr.

Bakare's precautionary suspension by allowing him to exercise privileges under

certain conditions.  Thereafter, Dr. Bakare received a comprehensive and fair

hearing regarding quality of care issues and MEC's corrective action.

This evidence demonstrates that Dr. Bakare was afforded the due process

contemplated by § 11112(a)(3) of HCQIA.  Indeed, that due process ultimately

resulted in the rejection of MEC's principal conclusions.  Accordingly, a reasonable

---

[32] The letter also informed Dr. Bakare that MEC recommended to the Board
of Directors that his appointment to the medical staff be revoked.  This letter
satisfied the safe harbor provision for a "Notice of Proposed Action," which
requires:

The physician has been given notice stating–
(A)(i)  that a professional review action has been proposed to be taken
        against the physician,
   (ii)  reasons for the proposed action,
(B)(i)  that the physician has the right to request a hearing on the
        proposed action,
   (ii)  any time limit (of not less than 30 days) within which to request
        such a hearing, and
(C)     a summary of the rights in the hearing under paragraph (3).

42 U.S.C. § 11112(b)(1); see also Mathews, 87 F.3d at 638 n.10.  Dr. Bakare does not
contest the adequacy of the notice or the conduct of the hearing.  See 42 U.S.C.
§ 11112(b)(2), (3).

jury could not conclude that Dr. Bakare was not provided adequate notice and

hearing procedures under HCQIA.[33]  See 42 U.S.C. § 11112(a)(3), (b), (c)(2).

### 4.     Reasonable Belief that the Actions Were Warranted

Finally, the court finds that the corrective action against Dr. Bakare "was

warranted by the facts known" by MEC.  42 U.S.C. § 11112(a)(4).  An independent

expert, who reviewed the patient charts, concluded that Dr. Bakare's care fell below

the standard.  This conclusion corroborated the findings of the QA Committee.

And, unfortunately, Dr. Bakare did not offer a rebuttal despite MEC's attempts to

secure his response to the quality of care issues.  Dr. Bakare candidly

acknowledged that he would have voted to suspend a physician given the

information that was presented to MEC.[34]  A reasonable jury, therefore, could not

conclude that MEC did not act in the "reasonable belief that the [recommendation

and precautionary suspension of his privileges] was warranted by the facts known

after reasonable effort to obtain facts."  42 U.S.C. § 11112(a)(4).

---

[33] Dr. Bakare argues that HCQIA immunity is inappropriate because MEC allegedly failed to follow the procedures set forth in the Medical Staff Bylaws (e.g., MEC did not provide Dr. Bakare with the expert's report before taking the corrective action on August 27, 2002).  The court need not determine whether MEC followed the Bylaws.  HCQIA immunity attaches when the reviewing body satisfies the requirements *under HCQIA*, regardless of its own policies and procedures.  The evidence of record reveals that Dr. Bakare has not overcome the presumption that MEC provided adequate due process within the ambit of HCQIA.

[34] The court's discussion regarding § 11112(a)(1)—reasonable belief that the action furthered quality health care—also supports this conclusion regarding § 11112(a)(4).  See supra Part III.A.1.

In sum, the court finds that Dr. Bakare has failed to adduce any evidence from which a reasonable jury could conclude that he has overcome, by a preponderance of the evidence, the presumption of compliance with the requirements of § 11112(a).  Accordingly, HCQIA immunity applies to the matter *sub judice*.[35]

### 5.      Scope of HCQIA Immunity

A finding that HCQIA immunity applies in the instant matter does not end the court's analysis.  A determination of the extent to which this immunity applies to plaintiff's antitrust, tortious interference with contract, breach of contract, and defamation claims is necessary.

The Act immunizes "(A) the professional review body, (B) any person acting as a member or staff to the body, (C) any person under a contract or other formal agreement with the body, and (D) any person who participates with or assists the body with respect to the action" from all damages claims which arise out of the peer review process.  42 U.S.C. § 11111(a)(1).  HCQIA immunity is not limited to individual physicians; it also applies to hospitals and corporate entities.  See id. § 11151(4)(A)(i), (11); see also Mathews, 883 F. Supp. at 1025-26.

Some, but not all, of Dr. Bakare's claims for damages are precluded by HCQIA immunity.  The following claims for damages clearly arise out of the peer

---

[35] In light of this finding that defendants are immune from money damages under HCQIA, it is unnecessary for the court to address the issue of immunity under the Pennsylvania Peer Review Protection Act.

review process, therefore triggering HCQIA immunity:  (1) breach of contract claim

with respect to the alleged breach of the Medical Staff Bylaws during the peer

review process, (2) tortious interference with the Hamilton contract claim, to the

extent that Dr. Bakare argues that his precautionary suspension caused Hamilton

to terminate the contract, and (3) defamation claims regarding statements made by

Dr. Kellis to MEC and FHC.[36]  See, e.g., Perez v. Pottstown Mem'l Med. Ctr., No. 97-

3334, 1998 WL 464916, at *14 (E.D. Pa. Aug. 3, 1998), aff'd, 210 F.3d 358 (3d Cir.

2000).  Other claims—the antitrust claims and the tortious interference with

contract and defamation claims with respect to Dr. Longenderfer's communication

to Hamilton's CEO—arguably arise out of the peer review process.  However, the

court need not determine whether HCQIA immunity applies because summary

judgment on these claims will be granted in favor of defendants on other grounds.[37]

Finally, claims relating to Dr. Moore's statements in the operating room lounge and

---

[36] The court notes that, regardless of whether HCQIA immunity applies, Dr. Bakare waived his defamation claim against Dr. Kellis.  During oral argument on the motions for summary judgment, Dr. Bakare abandoned this claim with respect to the letters that Dr. Kellis sent to two nurse midwives.  See Jordan v. Stanziola, 96 F. App'x 839, 841 n.2 (3d Cir. 2004) (stating that a party had abandoned a claim when "counsel explicitly abandoned that claim at oral argument"); see also FED. R. CIV. P. 56(d).  In addition, the court notes that Dr. Bakare did not oppose Dr. Kellis's motion for summary judgment with respect to Dr. Kellis's statements to MEC and FHC.  See D'Angio v. Borough of Nescopeck, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999) (providing that the non-moving party waived any argument when he failed to address it in a responsive brief); see also L.R. 7.6.  Accordingly, the court will grant summary judgment in favor of Dr. Kellis on the defamation claim without further discussion.

[37] See infra Parts III.B, III.C, III.E.1.

Dr. Bakare's moonlighting contract do not arise out of the peer review process and, therefore, are not covered under HCQIA immunity.

## B.   <u>Antitrust Claims</u>

Dr. Bakare asserts antitrust claims[38] against Pinnacle and Drs. Longenderfer, Kellis, Bronitsky,[39] and Evans[40] pursuant to Section 4 of the Clayton Act, which provides, in pertinent part, as follows:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15.  By limiting recovery to those persons injured "by reason of" an antitrust violation, this provision establishes a standing requirement, mandating

---

[38] Dr. Bakare claims violations of Sections 1 and 2 of the Sherman Act. Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of [antitrust violations]."  <u>Id.</u> § 2.

[39] During oral argument on the motions for summary judgment, counsel for Dr. Bakare indicated that plaintiff does not intend to pursue any antitrust claims against Dr. Bronitsky.  <u>See</u> <u>Jordan v. Stanziola</u>, 96 F. App'x 839, 841 n.2 (3d Cir. 2004) (stating that a party had abandoned a claim when "counsel explicitly abandoned that claim at oral argument"); <u>see also</u> Fed. R. Civ. P. 56(d). Accordingly, the court will grant summary judgment in favor of Dr. Bronitsky on the antitrust claims without further discussion.

[40] <u>See</u> <u>supra</u> note 24.

demonstration of cognizable antitrust injury.  See Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 273-74 (3d Cir. 1999).

Despite the broad language of the Clayton Act, which arguably would permit redress for injuries of any type, courts have construed these standing requirements much more narrowly.  See, e.g., HealthAmerica Pa., Inc. v. Susquehanna Health Sys., 278 F. Supp. 2d 423, 438 (M.D. Pa. 2003) (comparing "more demanding" requirements for antitrust standing to those for constitutional standing, "where any injury in fact will suffice").  "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and *that flows from that which makes defendants' acts unlawful.*"  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (emphasis added); see also Mathews, 87 F.3d at 641.  In other words, to be cognizable for purposes of antitrust standing, the plaintiff's loss must advance the anticompetitive agenda of the defendant.

In the instant case, Dr. Bakare's loss stems from his precautionary suspension.[41]  In an attempt to demonstrate antitrust injury, Dr. Bakare suggests that he was suspended to facilitate the proposed combination between Pinnacle and Hamilton's OB/GYN services.  Dr. Bakare's suggestion is pure speculation, unsupported by evidence of record.  Other than the temporal proximity of his suspension to the preliminary merger discussions between Hamilton and Pinnacle, Dr. Bakare has not produced any evidence to link these two events.  That Pinnacle and Hamilton were negotiating a potential combination at the time of his precautionary suspension does not automatically convert the suspension into a deliberate act in furtherance of the combination.  Indeed, of the twenty-eight MEC members who unanimously voted, with one abstention, to suspend Dr. Bakare, only

---

[41] Dr. Bakare argues that he also "has standing to seek redress for the harm to competition that *would have resulted* if Pinnacle's plans to combine the clinics had succeeded" because the combination allegedly would have resulted in the "diminution of the quality of care and choices of physicians."  (Doc. 158 at 6 (emphasis added)).  The court is unpersuaded.  First, Section 4 of the Clayton Act requires actual injury to the plaintiff seeking damages.  See 15 U.S.C. § 15 ("[A]ny person who *shall be injured* in his business or property . . . shall recover threefold the *damages by him sustained* . . . ." (emphasis added)); see also ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 839-41(5th ed. 2002) ("All plaintiffs seeking damages under Section 4 must first establish the existence of 'injury' to themselves, also referred to as 'impact' or 'fact of damage.'").  Moreover, the cases cited by Dr. Bakare for this argument are easily distinguishable from the instant case.  They involve either (1) an existing, not potential, agreement between hospitals and an anesthesiology group, (2) a request only for injunctive relief, as opposed to damages, or (3) harm to competition that had allegedly already occurred (i.e., not potential harm).  See Morales-Villalobos v. Garcia-Llorens, 316 F.3d 51 (1st Cir. 2003); Cmty. Publishers, Inc. v. DR Partners, 139 F.3d 1180 (8th Cir. 1998); Doctor's Hospital of Jefferson, Inc. v. Se. Med. Alliance, Inc., 123 F.3d 301 (5th Cir. 1997).

one—Dr. Kellis—had any involvement in the negotiations between Pinnacle and

Hamilton.[42]  (Doc. 103 ¶ 283; Doc. 113 ¶ 283.)  MEC imposed the precautionary

suspension after considering the QA Committee's evaluation of Dr. Bakare's care,

the report of an independent OB/GYN expert, comments from a member of the QA

Committee, and any previous responses by Dr. Bakare.[43]  Moreover, the initial

inquiry into several of the cases at issue began as early as December 1999, well

before any merger discussions.

Dr. Bakare argues that the nexus between his suspension and the Pinnacle-

Hamilton proposed combination is evidenced by the recognition that "cultural

issues" between Pinnacle and Hamilton staff could pose problems for the

combination and by virtue of Dr. Kellis's involvement in both his suspension and

the Pinnacle-Hamilton discussions.[44]  These arguments are without merit.  The

possibility of cultural issues arising between professional staff of combining entities

is a concern for practically *any* combination.  There is no evidence that Pinnacle,

Hamilton, or Dr. Kellis specifically viewed Dr. Bakare, or any other physician, as an

---

[42] Notably, Dr. Kellis's report to MEC did *not* recommend an immediate, precautionary suspension of Dr. Bakare.

[43] See supra Part III.A.

[44] Dr. Bakare also argues that the exclusive emergency room coverage proposal and Hamilton's desire to increase market share demonstrate that his removal from the market would facilitate the proposed combination.  (See Doc. 178 at 4-6.)  These arguments are unpersuasive.  The evidence cited by Dr. Bakare is merely indicative of the existence of merger discussions.  It does not establish a causal connection between these discussions and Dr. Bakare's precautionary suspension.

obstacle to the combination.  Nor is there evidence that *any* particular staffing

decision was integral to the combination.  Hamilton, not Pinnacle or Dr. Kellis,

would have made the final staffing decisions for the proposed combination and Dr.

Bakare offers no evidence that Hamilton had even considered the nature and scope

of Dr. Bakare's individual role in the combined clinics.[45]

Assuming *arguendo* that the proposed Pinnacle-Hamilton combination would

have violated the antitrust laws, Dr. Bakare proffers no evidence that he was

suspended to facilitate the proposed combination.  See Allegheny Gen. Hosp. v.

Philip Morris, Inc., 228 F.3d 429, 433 (3d Cir. 2000) (holding that because, *inter alia*,

the plaintiffs' "injuries are too remote from the [defendants'] alleged wrongdoing,

proximate cause is lacking, and thus the [plaintiffs] do not have standing to sue");

see also ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 848 (5th

ed. 2002) ("Courts have rejected claims where the plaintiff's injury is deemed

unrelated to the alleged antitrust violation . . . .").  The record supports the

---

[45] Dr. Bakare attempts to connect the merger discussions with his suspension
based upon a meeting between Pinnacle physicians, including Dr. Kellis, and
Hamilton's midwife during which the parties discussed staffing.  (See Doc. 178 at 2-
4.)  This purported evidence of a causal link is unavailing because the discussion
involved the *number* of physicians necessary for the combined clinic, not the *names*
of the physicians.  (Doc. 178, Ex. A at 24-25.)  Although Hamilton's midwife
ostensibly understood that only the Pinnacle physicians would be included in a
combined clinic (see Doc. 178, Ex. A at 25-26), this evidence, even if admissible at
trial, does not support Dr. Bakare's contention that he was suspended to facilitate
the proposed combination.  The discussion involved only *Pinnacle* physicians.
*Hamilton* physicians, who would have made the staffing decisions, did not
participate.  Moreover, there is no indication that Dr. Bakare's individual status was
even discussed, let alone affected this preliminary personnel planning.

conclusion that MEC suspended Dr. Bakare because of its concern for patient care, not for anticompetitive reasons.  Accordingly, the court finds that Dr. Bakare has not satisfied the standing requirement.  He cannot demonstrate that his alleged antitrust injury "flows from that which makes defendants' acts" allegedly unlawful. Brunswick Corp., 429 U.S. at 489.  Therefore, the court will grant summary judgment in favor of defendants on the antitrust claims.

### C.   Tortious Interference with Contract[46]

Under Pennsylvania law, the elements of a tortious interference with contract claim are:

---

[46] In his second amended complaint, Dr. Bakare raises tortious interference with contract claims regarding two distinct contracts—one with Pinnacle and one with Hamilton.  (Doc. 36 ¶¶ 144-48.)  Dr. Bakare concedes that the tortious interference with contract claim relating to Pinnacle is without merit.  (See Doc. 158 at 18-19.)  Accordingly, the court will grant summary judgment in favor of defendants on this claim.  In his brief in opposition to defendants' motion for summary judgment, Dr. Bakare raised a new tortious interference with contract claim relating to a contract with the University of Pennsylvania School of Nursing. (See Doc. 112 at 63-64.)  The court will not permit Dr. Bakare to raise a new claim in the context of an opposition brief.  See, e.g., Laurie v. Nat'l Passenger R.R. Corp., 105 F. App'x 387, 392-93 (3d Cir. 2004) (discussing cases that did not allow new claims raised in opposition to a motion for summary judgment).  The court previously denied Dr. Bakare's motion for leave to file a third amended complaint (see Doc. 81), which attempted to add this new tortious interference with contract claim (see Doc. 66, Ex. ¶¶ 131-33).  Moreover, even if the court had permitted the addition of a tortious interference claim, summary judgment would nevertheless be appropriate.  Pinnacle was a party to the subject contract with the University of Pennsylvania (Doc. 112 at 63; see also Doc. 36 ¶ 82), and it is axiomatic that a party cannot tortiously interfere with its own contract.  See Rutherfoord v. Presbyterian-Univ. Hosp., 612 A.2d 500, 507-08 (Pa. Super. Ct. 1992).  Accordingly, Dr. Bakare's only potential claim for tortious interference with contract involves the Hamilton contract.

(1)     the existence of a contractual . . . relation between the [plaintiff] and a third party;

(2)     purposeful action on the part of the defendant, specifically intended to harm the existing relation . . . ;

(3)     the absence of privilege or justification on the part of the defendant; and

(4)     the occasioning of actual legal damage as a result of the defendant's conduct.

CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 384 (3d Cir. 2004).  The burden of proving the absence of any privilege or justification is on the plaintiff.  See Buskirk v. Apollo Metals, 307 F.3d 160, 172 (3d Cir. 2002).  To determine whether a defendant's action was "proper" or justified, Pennsylvania courts consider the following factors:

(a)     the nature of the actor's conduct,

(b)     the actor's motive,

(c)     the interests of the other with which the actor's conduct interferes,

(d)     the interests sought to be advanced by the actor,

(e)     the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f)     the proximity or remoteness of the actor's conduct to the interference[,] and

(g)     the relations between the parties.

Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1388-89 (3d Cir. 1991) (citing RESTATEMENT (SECOND) OF TORTS § 767 (1979)).

In the matter *sub judice*, Dr. Bakare claims that Dr. Longenderfer tortiously interfered with his Hamilton contract by advising Hamilton's CEO that Dr. Bakare

could no longer supervise Hamilton's midwife.  Dr. Bakare contends that this

communication proximately caused the termination of his contract with Hamilton.[47]

The evidence of record demonstrates that Dr. Longenderfer's limited

communication to Hamilton's CEO was justified.  In addition, the record is devoid

of any evidence of specific intent to harm Dr. Bakare's contractual relationship with

Hamilton.  It was entirely appropriate for Dr. Longenderfer to communicate with

Hamilton's CEO concerning Dr. Bakare's unavailability because of Dr. Bakare's

role at Hamilton.  Indeed, a midwife from Hamilton was required to practice under

the supervision of a physician while at Pinnacle.  Prior to his precautionary

suspension, Dr. Bakare had acted as a supervising physician.  Dr. Longenderfer did

not reveal any confidential information.  He did not provide any specifics regarding

Dr. Bakare's precautionary suspension or MEC's proceedings.  He simply informed

Hamilton's CEO that Hamilton would need to appoint a new supervisor for its

---

[47] Dr. Bakare also claims that defendants tortiously interfered with his Hamilton contract by suspending his privileges.  However, HCQIA immunizes defendants from this claim, which arises out of MEC's professional review action. See supra Part III.A.5.  Dr. Bakare also appears to base this claim on the alleged "concerted action between Hamilton and Pinnacle to remove [him] from the relevant market."  (Doc. 112 at 61.)  As discussed supra, however, Dr. Bakare proffers no evidence that Hamilton or Pinnacle discussed his specific employment status when negotiating the proposed Pinnacle-Hamilton combination.  See supra Part III.B.  Hence, Dr. Bakare's unsupported speculation that Hamilton and Pinnacle conspired to remove him from the market cannot withstand summary judgment.

midwife.[48]  Both Pinnacle and Hamilton clearly had an interest in facilitating the

ability of Hamilton's midwife to practice at Pinnacle.  Dr. Longenderfer's directive

was limited, reasonable, and, in fact, necessary.  Given the evidence of record, a

reasonable jury could not conclude that Dr. Longenderfer intended to harm Dr.

Bakare's Hamilton contract or that Dr. Longenderfer was not justified in his limited

communication to Hamilton's CEO.  Accordingly, the court will grant summary

judgment in favor of defendants on the tortious interference with contract claim.

### D.    Breach of Contract[49]

#### 1.    Moonlighting

Under Pennsylvania law, "the test for enforceability of an agreement is

whether both parties have manifested an intention to be bound by its terms and

whether the *terms are sufficiently definite to be specifically enforced*."  USA Mach.

Corp. v. CSC, Ltd., 184 F.3d 257, 263 (3d Cir. 1999) (emphasis added).

---

[48] See 49 PA. CODE § 18.5(a) ("A midwife may not engage in midwifery practice without having entered into a collaborative agreement"); id. § 18.1 ("Collaborative agreement--A signed written agreement between a midwife and a collaborating physician . . . ."); id. ("Collaborating physician--A medical or osteopathic *medical doctor who has hospital privileges* in obstetrics, gynecology or pediatrics . . . ." (emphasis added)).  Surprisingly, Dr. Bakare denies defendants' assertion that he could not supervise Hamilton's midwife during his precautionary suspension.  (Doc. 113 ¶ 193; Doc. 103 ¶ 193.)  In support of this denial, Dr. Bakare simply indicates that other arrangements had been made for supervision of the midwife.  (Doc. 113 ¶ 193.)  This is a transparent deflection, not a properly supported denial.

[49] Under HCQIA, Pinnacle Health Hospitals—the only defendant named in Dr. Bakare's breach of contract claim—is immune with respect to the alleged breach of the Medical Staff Bylaws as this claim arises out of the professional review action.  See supra Part III.A.5.

In the matter *sub judice*, Dr. Bakare contends that there was either an express or an implied contract regarding moonlighting.  However, Dr. Bakare offers no evidence to support these contentions.  There is no writing specifying terms or evidencing an agreement on the issue of moonlighting.[50]  Although Dr. Bakare was *eligible* to be assigned to the on-call list because he had staff privileges at the hospital, nothing in the record suggests that this assignment was contractually *required*.  Indeed, Dr. Bakare acknowledged that he could be assigned "one day a month, two days a month, or no day at all."  See, e.g., M. Leff Radio Parts, Inc. v. Mattel, Inc., 706 F. Supp. 387, 396 (W.D. Pa. 1988) ("A contract which has absolutely no specifics defining the rights and responsibilities of the parties is not a contract at all and, thus, not enforceable." (citing Channel Home Ctrs. v. Grossman, 795 F.2d 291 (3d Cir. 1986)).

Dr. Bakare fails to present sufficient evidence to reach the jury on the breach of contract claim with respect to moonlighting.  Accordingly, the court will grant summary judgment in favor of defendant Pinnacle Health Hospitals on this claim.

---

[50] Dr. Bakare points to a provision of the Medical Staff Bylaws, which states that each member of the medical staff will "[a]ssist the Hospital in fulfilling its responsibilities for providing emergency and charitable care."  (Doc. 113, Ex. 16 art. II, § 6(B)), for the proposition that he had an express agreement to perform moonlighting.  This provision, however, simply describes Dr. Bakare's duties and responsibilities as a member of the medical staff.  It does not contain any specific terms that would obligate Pinnacle to assign him to the on-call list.

2.      **Breach of Confidentiality**

As a threshold matter, the court notes that Dr. Bakare did not plead a breach

of contract claim with respect to confidentiality.  (See Doc. 36 ¶¶ 149-55.)  The only

references to the improper disclosure of confidential information are found in Dr.

Bakare's tortious interference with contract and defamation claims.  (See Doc. 36

¶¶ 146, 157.)  The breach of contract claim regarding confidentiality first came to

light in Dr. Bakare's brief in opposition to defendants' motions for summary

judgment.[51]  (See Doc. 112 at 58-59.)  As previously noted, a party is not permitted to

raise new claims in opposition to a Rule 56 motion.  See, e.g., Laurie v. Nat'l

Passenger R.R. Corp., 105 F. App'x 387, 392-93 (3d Cir. 2004) (discussing cases that

did not allow new claims raised in opposition to a motion for summary judgment).

Hence, summary judgment in favor of defendant Pinnacle Health Hospitals is

warranted on this breach of contract claim.

Even if Dr. Bakare had properly raised a breach of contract claim based upon

the improper disclosure of confidential information, it would not survive summary

judgment.  First, there is no express term of confidentiality in the Medical Staff

Bylaws, the only written understanding between Pinnacle and Dr. Bakare.  See

28 PA. CODE § 107.12.  To the extent that Dr. Bakare contends that Pinnacle

---

[51] Dr. Bakare attempted to add this claim in a third amended complaint. (See Doc. 66, Ex. ¶ 124.a.)  However, the court denied Dr. Bakare's motion for leave to file a third amended complaint.  (See Doc. 81.)

breached an implied obligation of confidentiality[52]—based upon of Pinnacle's policy of confidentiality regarding MEC proceedings or the relationship between Pinnacle as a health care provider and Dr. Bakare as a staff physician—the court is unpersuaded.[53]   Under the doctrine of necessary implication in Pennsylvania, "[a] court may imply a missing term in a parties' contract only when it is necessary to prevent injustice and it is *abundantly clear* that the parties intended to be bound by such term." Glassmere Fuel Service, Inc. v. Clear, 900 A.2d 398, 403 (Pa. Super. Ct. 2006); see also In re IT Group, Inc., 448 F.3d 661, 671 (3d Cir. 2006) ("[The doctrine of necessary implication] is only employed to imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." (emphasis removed)).

---

[52] Dr. Bakare alleges that the breaches occurred when: (1) Dr. Moore communicated the existence and substance of MEC proceedings to nurses in the operating room lounge, (2) Dr. Longenderfer told Hamilton's CEO that Dr. Bakare could no longer supervise Hamilton's midwife and that Hamilton would need to identify a new supervisor, and (3) Dr. Kellis wrote letters to two midwives informing them that Dr. Bakare no longer had privileges at Pinnacle Health Hospitals and that they would need to make arrangements with a new supervising physician.

[53] Dr. Bakare offers no cases, and the court finds none, that establish an implied confidentiality term under Pennsylvania common law.  Notably, Pennsylvania law governing the content of medical staff bylaws—the contract between a hospital and its physicians—does *not* require a confidentiality term. See 28 PA. CODE § 107.12.

In the matter *sub judice*, there is no clear evidence of an implied confidentiality term. Dr. Bakare proffers no evidence that the parties discussed, intended, or even contemplated, such a term. He relies solely on the confidentiality policy expressed *during MEC proceedings* by MEC members. But his reliance is misplaced because no such policy is identified in or implicated by Dr. Bakare's contract with Pinnacle.[54]  MEC's confidentiality policy is irrelevant to Dr. Bakare's contract claim. Accordingly, the court finds that the parties did not clearly intend to be bound by a confidentiality term. Therefore, the court will not imply such a term in the parties' contract and will grant summary judgment in favor of defendant Pinnacle Health Hospitals on this claim.

---

[54] Dr. Bakare also argues that the Pennsylvania Peer Review Protection Act mandates confidentiality. See 63 PA. STAT. ANN. § 425.4 ("The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action . . . ."). It is undisputed, however, that this state statute does not confer a private cause of action. The statute "seeks to foster the greatest candor and frank discussion at medical review committee meetings. . . . [T]hrough grants of immunity and confidentiality the state hopes to encourage peer evaluation of health care provided so as to (1) improve the quality of care rendered; (2) reduce morbidity and mortality; and (3) keep within reasonable bounds the costs of health care." McClellan v. Health Maint. Org. of Pa., 686 A.2d 801, 805 (Pa. 1996). In other words, the Act is designed to safeguard the peer review process, and not to provide a private right of action to the physician under review.

46

E.    **Defamation**

Under Pennsylvania law, a claim of defamation requires the plaintiff to

establish, *inter alia*, the defamatory nature of the communication, publication by

the defendant, understanding by both the defendant and recipients of its

defamatory nature, special harm resulting from the publication, and abuse of a

conditionally privileged occasion.  42 PA. CONS. STAT. § 8343(a); see also Zugarek v.

S. Tioga Sch. Dist., 214 F. Supp. 2d 468, 480 (M.D. Pa. 2002).  The defamatory nature

of a particular statement is a question of law for the court.  Id.  A defamatory

statement is one that presents untrue facts tending to "harm the reputation of

another as to lower him in the estimation of the community or to deter third

persons from associating or dealing with him."  Remick v. Manfredy, 238 F.3d 248,

261 (3d Cir. 2001).

Truth is an absolute defense to a defamation claim.  See 42 PA. CONS. STAT.

§ 8343(b); Simms v. Exeter Architectural Prods., Inc., 916 F. Supp. 432, 437 (M.D.

Pa. 1996) (citing Corabi v. Curtis Publ'g Co., 273 A.2d 899, 908 (Pa. 1971)).  Likewise,

the publisher of a defamatory statement is not liable if a privilege applies.  See id. at

436.  A conditional privilege arises "when the communication involves an interest of

the publisher, the recipient, a third party or the public."  Id.; see also Rue v. K-Mart

Corp., 691 A.2d 498, 509 (Pa. Super. Ct. 1997) ("Such a [conditional] privilege

attaches when the statement is made on a proper occasion, in a proper manner, for

a legitimate reason of the speaker and is based on reasonable cause.").  However,

this conditional privilege may not attach if the plaintiff demonstrates that the

defendant abused the privilege by communicating in a reckless or negligent manner or by exceeding the necessary scope of the communication.  See Simms, 916 F. Supp. at 436; see also Rue, 691 A.2d at 509.

A plaintiff need not prove special harm, i.e., pecuniary loss, if the communication is defamation *per se*.  Franklin Prescriptions, Inc. v. NY Times Co., 424 F.3d 336, 343 (3d Cir. 2005).  Nevertheless, a plaintiff must prove general damages—i.e., "proof that one's reputation was actually affected by the slander, or that [the plaintiff] suffered personal humiliation, or both."  Id. (quoting Walker v. Grand Cent. Sanitation, Inc., 634 A.2d 237, 242 (Pa. Super. Ct. 1993)); see also Brinich v. Jencka, 757 A.2d 388, 397 (Pa. Super. Ct. 2000).  Defamation *per se* "occurs where a publication 'imputes to another conduct, characteristics, or a condition that would adversely affect her in her lawful business or trade.'"  Franklin Prescriptions, 424 F.3d at 343 (quoting Walker, 634 A.2d at 241).

## 1.    **Dr. Roger Longenderfer**

Dr. Bakare bases his defamation claim against Dr. Longenderfer on Dr. Longenderfer's conversation with Hamilton's CEO.  After Dr. Bakare's suspension, Dr. Longenderfer informed her that Dr. Bakare could no longer supervise Hamilton's midwife and that Hamilton would need to identify a new supervisor. These statements were clearly true[55] and, therefore, cannot be the basis for a defamation claim.  See 42 Pa. Cons. Stat. § 8343(b); Simms, 916 F. Supp. at 437.

---

[55] See supra note 48.

In addition, the court finds that Dr. Longenderfer's statements were conditionally privileged and that a reasonable jury could not conclude that Dr. Longenderfer abused that privilege. As previously discussed in the context of Dr. Bakare's tortious interference with contract claim, Dr. Longenderfer's communication was limited. He revealed only the information necessary to protect the interests of both Pinnacle and Hamilton; he did not divulge impertinent or scandalous details of Dr. Bakare's precautionary suspension. Accordingly, the court will grant summary judgment in favor of Dr. Longenderfer on this claim.

## 2. **Dr. Barry B. Moore**

Dr. Bakare bases his defamation claim against Dr. Moore on Dr. Moore's conversation with nurses in the operating room lounge. The parties present different accounts of Dr. Moore's communication. Dr. Moore contends that his statements were true and therefore cannot be the basis for a defamation claim. He asserts that he merely responded to the nurses' questions and informed them that Dr. Bakare's temporary suspension related to quality of care. In contrast, Dr. Bakare relies upon Nurse Dodson's account. According to Nurse Dodson, Dr. Moore informed the nurses that Dr. Bakare was under investigation for rendering inadequate care. Dr. Bakare also relies upon the declaration of his former attorney, Renardo L. Hicks, Esquire. Attorney Hicks asserts that Dr. Moore admitted to him that he told the nurses in the operating room lounge that Dr. Bakare provided bad care.

49

Clearly, these are factual disputes which must be resolved by a jury.  Given
the evidence of record, a reasonable jury could conclude that Dr. Moore informed
the nurses that Dr. Bakare provided bad care and that this statement was false.[56]  If
the jury so concludes, this communication constitutes defamation *per se* because it
ascribes to Dr. Bakare conduct that would adversely affect him in his profession.
See Franklin Prescriptions, 424 F.3d at 343; see also Smith v. IMG Worldwide, Inc.,
No. 03-4887, 2006 WL 1582329, at *9-10 (E.D. Pa. June 7, 2006).  Therefore, Dr.
Bakare need only prove general damages.  See Franklin Prescriptions, 424 F.3d at
343.  In the context of its summary judgment analysis, the court finds sufficient
evidence of general damages based on the humiliation and embarrassment
allegedly suffered by Dr. Bakare when learning of Dr. Moore's communication.[57]
Accordingly, the court will deny summary judgment on Dr. Bakare's defamation
claim against Dr. Moore.[58]

---

[56] Dr. Moore also argues that his communication was conditionally privileged.
This privilege argument, however, is based upon *Dr. Moore's disputed account* of the
communication with the nurses.  A jury must resolve this factual dispute regarding
the nature and extent of Dr. Moore's communication.

[57] When the court ordered supplemental briefing on Dr. Bakare's defamation
claim against Dr. Moore, it directed the parties to address whether causation was
an appropriate issue for summary disposition.  (See Doc. 177 n.1.)  In light of the
disputed facts surrounding this claim, the court considers this issue to be moot.

[58] Dr. Bakare's defamation claim against Pinnacle Health Hospitals and
Pinnacle Health System is based on vicarious liability.  These defendants do not
dispute that Dr. Moore was an employee or was acting withing the scope of his
employment.  Therefore, the court will also deny summary judgment on the
defamation claim against Pinnacle Health Hospitals and Pinnacle Health System.

**IV.**    **<u>Conclusion</u>**

For the reasons set forth above, the motions for summary judgment are

granted in part and denied in part.  An appropriate order will issue.


                                          <u>  /s/ Christopher C. Conner  </u>
                                          CHRISTOPHER C. CONNER
                                          United States District Judge

Dated:      August 24, 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AYODEJI O. BAKARE, M.D.,** | : | **CIVIL ACTION NO. 1:03-CV-1098** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **PINNACLE HEALTH HOSPITALS,** | : | |
| **INC., et al.,** | : | |
| | : | |
| **Defendants** | : | |

**ORDER**

AND NOW, this 24th day of August, 2006, upon consideration of defendants'

motions for summary judgment (Docs. 93-97) and to strike portions of plaintiff's

affidavit (Doc. 123), and for the reasons set forth in the accompanying

memorandum, it is hereby ORDERED that the motions (Doc. 93-97, 123) are

GRANTED in part and DENIED in part as follows:

1.    The motion for summary judgment (Doc. 93) on immunity under the
      Health Care Quality Improvement Act, 42 U.S.C. §§ 11101-11152, is
      GRANTED in favor of defendants.[59]

2.    The motion for summary judgment (Doc. 94) on plaintiff's antitrust
      claims is GRANTED in favor of defendants Pinnacle Health System,
      Pinnacle Health Hospitals, Roger Longenderfer, M.D., Dana Kellis,
      M.D., Carl Bronitsky, M.D., and David J. Evans, M.D.

---

[59] By granting immunity under the Health Care Quality Improvement Act, it
is unnecessary for the court to address the issue of immunity under the
Pennsylvania Peer Review Protection Act.

3.      The motion for summary judgment (Doc. 95) on plaintiff's tortious
        interference with contract claims is GRANTED in favor of defendants
        Pinnacle Health System, Pinnacle Health Hospitals, Roger
        Longenderfer, M.D., Dana Kellis, M.D., Carl Bronitsky, M.D., and
        David J. Evans, M.D.

4.      The motion for summary judgment (Doc. 96) on plaintiff's breach of
        contract claims is GRANTED in favor of defendant Pinnacle Health
        Hospitals.

5.      The motion for summary judgment (Doc. 97) on plaintiff's defamation
        claims is GRANTED with respect to these claims against defendants
        Roger Longenderfer, M.D. and Dana Kellis, M.D.  The motion is
        otherwise DENIED.

6.      The Clerk of Court is directed to defer the entry of judgment until the
        conclusion of this case.

7.      Defendants' motion to strike portions of plaintiff's affidavit  (Doc. 123)
        is DENIED as moot.


                                         _ /s/ Christopher C. Conner___
                                         CHRISTOPHER C. CONNER
                                         United States District Judge